Annalee PATTERSON *v.*
ARKANSAS DEPARTMENT of HEALTH, Employer;
Arkansas Insurance Department, Carrier;
Second Injury Trust Fund

CA 99–438 15 S.W.3d 701

Court of Appeals of Arkansas
Divisions II, III, and IV
Opinion delivered May 3, 2000
[Petition for rehearing denied June 7, 2000.]

*Larry Hartsfield,* for appellant.

*Richard S. Smith,* for appellees Arkansas Department of Health and Arkansas Insurance Department.

*Judy W. Rudd,* for appellee Second Injury Fund.

MARGARET MEADS, Judge. This case involves an appeal and a cross-appeal from a decision in which the Workers' Compensation Commission held that the preponderance of the evidence shows that appellant is not permanently and totally disabled and that Second Injury Fund (SIF) has no liability. We reverse and remand on direct appeal and affirm on cross-appeal.

At the hearing on appellant's claim, it was stipulated that appellant, Annalee Patterson, sustained a compensable injury on December 19, 1991, and that appellees, Arkansas Department of Health (ADH) and the Arkansas Insurance Department, Public Employee Claims Division, have accepted and are paying benefits consistent with a twenty-five percent anatomical impairment. Appellant contended that she is permanently and totally disabled as a result of her compensable injury. ADH contended that appellant's disability did not exceed her anatomical impairment and, alternatively, that any wage-loss suffered by appellant is SIF's responsibility. SIF contended that it has no liability; that appellant's disability was solely the result of her job-related injury; and that she is not entitled to benefits for disability exceeding her anatomical impairment because ADH had made a *bona fide* offer of employment at wages equal to or greater than appellant's average weekly wage at the time of the "re-injury."

Appellant, who was forty-seven years old on the date of the hearing, is a registered nurse who was employed in an administrative position by ADH on December 19, 1991, when she sustained a back injury after reaching across her desk to plug in a surge protec-

tor. She felt an immediate, sharp pain in her lower back. She was initially treated by Dr. John Wilson, who referred her to Dr. Jim Moore, a neurologist, who eventually performed five spinal surgeries on appellant as a result of her injury. Subsequent to surgery in 1994, appellant developed arachnoiditis[1] in the lower thecal sac, for which there is no specific treatment other than pain management. After surgery performed on July 11, 1995, appellant developed a cerebrospinal fluid leak (CSF), which is not a normal result of that surgery. Appellant also suffers from migraine headaches and Sjogren's syndrome and has been diagnosed with depression, failed spinal surgery syndrome, and cauda equina[2] syndrome. Appellant is currently taking a narcotic synthetic codeine three times a day for pain, anti-inflammatories for Sjogren's syndrome, and blood pressure medication.

At the hearing on her claim, appellant testified that as a result of her injury and surgeries she spends most of the day in bed due to pain. She generally spends the morning sitting in a recliner or wheelchair. By noon her legs swell to the knees. She has developed foot drop in both feet as a result of the surgeries and drags her toes; because she does not have a steady leg to stand on, she cannot use crutches. She is unable to walk any distance. Appellant suffered from migraine headaches prior to her first surgery, but they are now more frequent. Prior to her last surgery, appellant was able to work as a part-time consultant because she was still mentally alert. After the last surgery, appellant developed cognitive problems and has experienced a change in her ability to think, to remember, and to perform mental tasks; Dr. Moore told her she is incapable of working. Since 1986, appellant has been afflicted with Sjogren's syndrome, a condition involving the inability of a gland to secrete; however, she never missed any work due to this condition, and she was able to do her job.

Appellant testified that she would prefer to go back to work, but since her 1991 injury ADH has not offered her job back at full

---

[1] Thickening and adhesions of the leptomeninges in the brain or spinal cord resulting from previous meningitis, other disease processes, or trauma. *Sloan-Dorland Annotated Medical-Legal Dictionary* 48 (1987).

[2] The bundle of spinal nerve roots arising from the lumbrosacral enlargement and medullary cone and running through the lumbar cistern within the vertebral canal below the first lumbar vertebra; it comprises the roots of all the spinal nerves below the first lumbar. *PDR Medical Dictionary* (1st ed. 1995).

pay, and after she used all her "comp" time, vacation time, and sick leave, ADH asked her to resign. She does not believe that she can withstand an eight-hour job or sit behind a desk forty hours per week. If she stays up more than three or four hours a day, the next day she hurts so badly that she cannot move. Appellant is never free of pain. Her husband helps her bathe and dress, then takes her to the sun porch where she sits in a wheelchair or recliner. She normally sleeps between 9 a.m. and noon, then watches television until 2 or 3 p.m. She lies down until her husband gets home and cooks supper. She now rarely cooks. The activity of having to lift pots and pans and having to concentrate is difficult, and she burns things "all the time." She retires about 8 p.m., but cannot sleep all night because of leg cramps. Appellant has no sensation in the lower part of her legs.

Once a month, appellant takes calls for ADH as part of a back-up service for home health nurses. This involves consulting a list of nurses and notifying them that they have a call, for which appellant is paid $25 per day. Appellant has also answered questions over the telephone about ADH supplies.

The medical evidence reveals that appellant suffered a series of back problems which have not resolved despite several surgeries. After her last back surgery, appellant suffered several falls. Her vehicle was equipped with hand controls, but she had difficulty learning to use them. She continues to have intense pain. After appellant developed the CSF leak, she experienced severe low-back pain radiating into the right lower extremity and severe spasms, which interfere with her daily living and ambulation. A Baptist Rehabilitation Institute (BRI) report dated August 14, 1995, states that since the CSF leak, appellant has an increased risk of falls, and declines in activities of daily living, self care, and mobility. In September 1995, it was noted that appellant required a ramp built for entry into her house. In December 1995, Dr. Thomas Shinder diagnosed appellant with arachnoiditis and significant behavioral overlay enhancing non-physiological neurological examination. He was of "somewhat" firm conviction that appellant has primary psychological overlay causing the majority of her symptoms. On April 2, 1996, Dr. Shinder wrote that he expected appellant to be at full improvement and ready to return to work within the next two months. However, in a Physician's Statement of Medical Necessity dated April 18, 1996, Dr. Shinder prescribed a TENS unit with a

diagnosis of "failed back syndrome" and a prognosis of "fair," and on May 17, 1996, Dr. Shinder admitted appellant to the hospital. Dr. William Ackerman, who examined appellant at Dr. Shinder's request, noted on May 22, 1996, that appellant's pain was severe and that she was in a wheelchair.

Dr. Reginald Rutherford, who initially saw appellant in Dr. Shinder's absence, noted on August 30, 1996, that appellant's complaints are referable to her documented arachnoiditis for which there is no specific treatment other than pain management, and that she has been treated with anti-convalescents and anti-depressants without benefit. Dr. Shinder arranged for physical therapy, the goal being to increase appellant's level of functioning so that she may get out of the wheelchair. However, on October 1, 1996, Dr. Rutherford noted that physical therapy proved without benefit, and there was no rational basis for further physical therapy. Dr. Rutherford considered appellant capable of working in a sedentary capacity, dependent upon her motivation and whether or not she would be accommodated by her employer. On October 1, 1996, Dr. Rutherford noted appellant had undergone five lumbar spinal surgeries complicated by arachnoiditis, which yields a DRE category 5 impairment for lumbosacral disorders, and he assigned appellant a twenty-five percent impairment to the person as a whole.

Dr. Moore did not agree with Dr. Rutherford's assessment. On October 3, 1996, Dr. Moore noted that appellant has continued and ongoing pain problems. She is on pain medication, which is ineffective in giving her long-term relief. She obtained rehabilitative treatment at BRI where a number of exercises in "relative futility" were carried out. Her leg braces have been removed, which tends to relegate her even more to her wheelchair because she has no functional capacity in dorsiflexion, eversion, or inversion in the ankles. She remains neurologically compromised and is relegated to her wheelchair. She is compromised as far as peroneal sensation (relating to the lateral side of the leg or to the muscles there present), which goes along with the cauda equina syndrome and arachnoiditis which have been established in her ongoing evaluation. Dr. Moore believed appellant's residuals would be significant and assessed them at sixty percent to the body as a whole. On November 4, 1996, Dr. Moore wrote that appellant's neurological residuals remain significant; she is essentially relegated to a wheelchair; and she has sensory deprivation. He did not believe appellant

capable of returning to working activities unless possibly in sedentary activities, but "certainly medication will be required and this would only be on a trial basis." He felt that considering her various neurologic residuals with the foot drop and sensory alterations, an off-work status was appropriate.

In a consultation report dated November 11, 1996, Dr. Ackerman noted that he had nothing further to offer with respect to pain management. He felt that appellant might benefit from an aquatic therapy program with the institution of progression-resistive exercises to attempt to get her out of a wheelchair to a walker with the ultimate goal of increasing her daily activities. Dr. Ackerman felt that appellant may ultimately be a candidate for a subarachnoid morphine drug delivery system.

The administrative law judge (ALJ) found that the preponderance of the evidence shows that appellant has not been rendered permanently and totally disabled, but sustained permanent disability in an amount equal to eighty percent to the body as a whole, including anatomical impairment of twenty-five percent and wage-loss disability of fifty-five percent. He further found that the preponderance of the evidence fails to show that there has been a combination of the effects of a prior disability or impairment with the effects of appellant's compensable injury to produce permanent disability or impairment greater than that resulting from the compensable injury alone, and fails to show that appellant received a *bona fide* offer of employment at wages equal to or greater than her average weekly wage at the time of her injury. The full Commission affirmed and adopted the ALJ's findings.

 When reviewing a decision of the Workers' Compensation Commission, we view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the findings of the Commission and affirm that decision if it is supported by substantial evidence. *Clark v. Peabody Testing Service,* 265 Ark. 489, 579 S.W.2d 360 (1979). Substantial evidence is that relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Harvest Foods v. Washam,* 52 Ark. App. 72, 914 S.W.2d 776 (1996). The Commission's decision should not be reversed unless it is clear that fair-minded persons could not have reached the same conclusions if presented with the same facts. *Johnson v. Democrat Printing and Lithograph,* 57 Ark. App. 274, 944 S.W.2d 138

(1997). Where the Commission denies a claim because of the claimant's failure to meet his burden of proof, the substantial-evidence standard of review requires that we affirm the Commission's decision if its opinion displays a substantial basis for the denial of relief. *Buford v. Standard Gravel Co.*, 68 Ark. App. 162, 5 S.W.3d 478 (1999). These rules insulate the Commission from judicial review and properly so, as it is a specialist in this area; however, a total insulation would render the appellate court's function in reviewing these cases meaningless. *Id.*

Appellant argues that the Commission erred in finding that she had not been rendered permanently and totally disabled, because the "odd-lot" doctrine is applicable to her 1991 injury. We first note that Act 796 of 1993 abolished the odd-lot doctrine for permanent disability claims on injuries that occurred after July 1, 1993. However, because appellant's injury was sustained in 1991, the odd-lot doctrine is applicable to her case.

██ ██ The odd-lot doctrine refers to employees who are able to work only a small amount; the fact that they can work some does not preclude them from being considered totally disabled if their overall job prospects are negligible. *M.M. Cohn Co. v. Haile*, 267 Ark. 734, 589 S.W.2d 600 (Ark. App. 1979). An employee who is injured to the extent that she can perform services that are so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist may be classified as totally disabled. *Lewis v. Camelot Hotel*, 35 Ark. App. 212, 816 S.W.2d 632 (1991). If the evidence of degree of obvious physical impairment, coupled with other factors such as claimant's mental capacity, education, training, or age, places appellant *prima facie* in the odd-lot category, the burden should be on the employer to show that some kind of work is regularly and continuously available to the appellant. *M.M. Cohn, supra.* Because of appellant's total and permanent disability claim, appellee was on notice that the odd-lot doctrine was at issue. *Walker Logging v. Paschal*, 36 Ark. App. 247, 821 S.W.2d 786 (1992).

In the opinion that was affirmed and adopted by the full Commission, the law judge wrote:

> Her testimony and the medical record shows that she did fairly well until after the last surgery, which resulted in a cerebrospinal fluid leak. In spite of extensive follow up care, which included a clot patch for the CSF leak, additional diagnostic stud-

ies, medication, adhesiolysis, and physical therapy, the claimant experienced little relief from her difficult symptoms.

At the time of the hearing she testified that she spent most of the day in bed due to pain, by noon her legs were swollen to the knees. She further stated that she is up only about four hours a day, spends about three and a half hours in a wheel chair, and has very limited ability to walk, even with crutches. She further testified that she has foot drop in both legs and now has very intense headaches which interfere with her ability to sleep and her activities of daily living. She also described a decline in her mental acuity, which included difficulty with her memory and cognitive functions. She stated that since the last surgery she has not had an offer of employment at equivalent pay, but was instead asked to resign after she had used up her sick leave and compensatory time. She also doubted that she could handle a full time job because she could not stay up more than three or four hours without experiencing an increase in pain which makes it difficult for her to move. However, from time to time, about once a month, she takes calls for the Health Department on the weekends, assisting in locating nurses in the county from which the call originated. She is also able to do a limited amount of other telephone work and some paperwork. However, *this limited employment* is not equivalent to her usual employment which had paid more than $30,000.00 per year.

On October 1, 1996, Dr. Reginald J. Rutherford wrote that he considered the claimant capable of working in a sedentary capacity, depending on her motivation and whether the employer is accommodating, and then assessed her anatomical impairment at 25% to the body as a whole, which was accepted by respondents 1. On October 3, 1996, Dr. Moore wrote that the claimant's residuals were going to be significant, noting that she had cauda equina syndrome and arachnoiditis, and he rated her impairment at 60% to the body as a whole. He also remarked that the claimant would require ongoing medication that is generally best provided by a pain clinic surrounding. On November 4, 1996, he wrote that he did not believe that the claimant was "capable of returning to working activities, possibly sedentary, but certainly medication will be required...." He noted that the claimant had ongoing cauda equina syndrome which is not thought likely to improve.

When the entire record is reviewed, in light of the claimant's age, education, work experience, level of motivation, physical condition, and other matters reasonably expected to affect her future earning capacity, the preponderance of the evidence shows

that she has sustained substantial permanent disability but has not been rendered permanently and totally disabled. Even though she had sustained a significant low back injury and undergone four surgeries, the claimant continued to return to the work place, until the consequences of the last surgery, which were more substantial. Even though she is severely limited by her physical condition and the effects of the medication related to her compensable injury, she has been able to undertake *limited employment* by being on call, being available to give advice over the telephone, and by doing paperwork, *employment which is not constant in its demands on the claimant's time, but which is not full time and are [sic]not widely available with other employers.* (Emphasis ours.)

We think from a reading of the ALJ's opinion, which was adopted by the Commission, that fair-minded persons with the same facts before them could not have reached the same conclusions. Indeed, there is no suggestion that appellant's testimony is not credible, and the opinion outlines appellant's severe and ongoing medical problems. Further, Dr. Moore, appellant's treating physician, did not believe appellant capable of returning to work, unless possibly in sedentary activities, but "certainly medication will be required" and only on a trial basis. Moreover, the evidence is that appellant needs continuing pain medication, which is ineffective in giving her long-term relief and which impairs her ability to think. We are not unmindful of Dr. Rutherford's opinion that appellant is able to return to work and that conflicts in the medical evidence are a question of fact for the Commission. When the Commission chooses to accept the testimony of one physician over another in such cases, we are powerless to reverse the decision. *Henson v. Club Prods.,* 22 Ark. App. 136, 736 S.W.2d 290 (1987). However, we note that the ALJ's opinion is silent in regard to any findings of credibility and fails to state that it accepts Dr. Rutherford's opinion over that of Dr. Moore. Finally, we think it significant that the ALJ's opinion states that appellant has performed some employment which is not constant in its demands on the claimant's time, *but which is not full-time and is not widely available with other employers.* This language substantially tracks the language required for a finding of total disability under the odd-lot doctrine.

Considering appellant's obvious physical impairment, work experience, and medical evidence, we hold that appellant made a *prima facie* case that she was totally and permanently disabled as a result of her five surgeries necessitated by her compensable

injury, and the burden shifted to appellee to show that work is readily and consistently available within appellant's capabilities. Appellee did not meet this burden, and indeed the law judge recognized that any work appellant performed was not full-time and not readily available with other employers. The Commission should have awarded appellant permanent and total disability benefits; therefore, we reverse and remand for an award of benefits.

On cross-appeal, ADH and the Public Employee Claims Division argue that the Commission erred: (1) in finding that appellant was entitled to an additional fifty-five percent wage–loss disability; (2) in finding that appellant did not receive a *bona fide* offer of employment from ADH; and (3) in finding that SIF had no liability. Because of the view we take of this case, we do not address cross-appellants' first argument.

█ In regard to cross-appellants' argument that the Commission erred in finding that appellant did not receive a *bona fide* offer of employment from ADH, we simply note that the Commission found that the preponderance of the evidence fails to show that appellant received a *bona fide* offer of employment at *wages equal to or greater than her average weekly wage at the time of the injury.* Appellant testified that she currently works for the health department part-time and earns about $100.00 per month. She also testified that no one with the health department has offered her a job back at full pay since the injury in 1991, and after she used up all her "comp" time, vacation time, and sick leave, she was asked to resign. ADH offered no testimony to the contrary, and under the circumstances we cannot say there is no substantial evidence to support the Commission's finding on this matter.

█ Cross-appellants also argue that the Commission erred in finding that SIF had no liability in this case. The test that is used to determine whether SIF has liability for compensating an injured worker was set out in *Mid-State Constr. Co. v. Second Injury Fund*, 295 Ark. 1, 5, 746 S.W.2d 539, 541 (1988), as follows:

> First, the employee must have suffered a compensable injury at his present place of employment. Second, prior to that injury the employee must have had a permanent partial *disability* or *impairment*. Third, the disability or impairment must have combined with the recent compensable injury to produce the current disability status. [Emphasis in original.]

Appellant was diagnosed in 1986 with Sjogren's syndrome, which usually affects her eyes and salivary glands, and has been taking medication for this condition since that time. Prior to the 1991 accident, appellant never missed a day's work due to this condition. Appellant testified that she was not limited in any way from her Sjogren's disease before her 1991 injury, and that it only caused her jaw to swell, and her salivary glands and tear ducts to dry out.

On April 29, 1997, Dr. Robert Cheek wrote that he did not believe appellant's Sjogren's syndrome is either a cause or contributing factor to her present physical disability which has been present since her initial back injury. Dr. Eleanor Lipsmeyer, a rheumatologist who treated appellant's Sjogren's syndrome, testified by deposition on September 24, 1997, that Sjogren's does not interfere with one's ability to work, and she does not think that it interfered with appellant's functioning in any way. She agreed with Dr. Cheek's assessment that appellant's Sjogren's syndrome is neither a cause nor a contributing factor to appellant's present disability. While she agreed with Dr. Cheek's assessment that five percent of appellant's current disability is due to Sjogren's disease, she said that refers only to the swollen glands, dry eyes and mouth, and pain in her hands. Dr. Lipsmeyer testified further that there is no evidence that Sjogren's has affected appellant's central nervous system.

The ALJ found that the record failed to show that there was a combination of the effects of appellant's compensable injury with any prior disability or impairment to yield disability greater than that arising from the compensable injury alone. This finding is supported by substantial evidence, and the Commission did not err when it found SIF has no liability in this case.

Reversed and remanded on direct appeal.

ROBBINS, C.J., BIRD, NEAL, and STROUD, JJ., agree.

HAYS, S.J., JENNINGS, PITTMAN, and ROAF, JJ., dissent.

Affirmed on cross-appeal.

ROBBINS, C.J., HAYS, S.J., BIRD, NEAL, STROUD, JENNINGS, PITTMAN, and ROAF, JJ., agree.

John E. Jennings, Judge, dissenting. I have no serious disagreement with the majority's view as to the applicable law, but I cannot agree with the majority that the appellee falls prima facie in the odd–lot category as a matter of law.

Certainly whether the claimant is "odd–lot" was initially a fact question for the Commission to decide. *See Lewis v. Camelot Hotel,* 35 Ark. App. 212, 816 S.W.2d 632 (1991). The factors to be considered in making that assessment are the degree of obvious physical impairment, together with the claimant's mental capacity, education, training, and age. *See Hyman v. Farmland Feed Mill,* 24 Ark. App. 63, 748 S.W.2d 151 (1988). In *Lewis,* we reversed the Commission's decision that the claimant did not fall within the odd–lot category. The claimant in that case was a fifty-five-year-old banquet manager. He was a high-school graduate whose prior experience was primarily as a waiter. It was clear that his right leg had been crushed in an on-the-job accident.

In *Moser v. Arkansas Lime Company,* 40 Ark. App. 108, 842 S.W.2d 456 (1992), we came to the same conclusion. There the claimant was a sixty-two-year-old laborer with a fifth-grade education who had lost the use of his right eye. The Commission in *Moser* found as a fact that the claimant was "borderline mentally retarded."

In the case at bar, the claimant is a forty-seven-year-old registered nurse. The Commission found that she had a twenty-five percent anatomical disability resulting from her on-the-job injury. The Commission was entitled to make this finding based on the evidence before it. There was evidence that she could work and that her employer would take necessary steps to accommodate her disability. Had the Commission found that this claimant was 100% permanently and totally disabled, I believe that such a decision might well have been supported by substantial evidence. Instead, the Commission found that she was eighty percent permanently and totally disabled. On the facts of this case, I am persuaded that reasonable minds could reach that conclusion. I cannot agree that the claimant falls within the odd–lot category as a matter of law.

For the reasons stated, I respectfully dissent. I agree with the majority opinion on the cross-appeal. I am authorized to state that

Judges PITTMAN and ROAF, and Special Judge HAYS join in this opinion.